# EXHIBIT F

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

_____

TYREL ESCOBAR,

     Plaintiff,

  -against-                              Case No.:

DET. LUIS CORREA; DET. JAMIE             22 cv 08434

ROSADO; U.S. MARSHAL KEVIN

KAMROWSKI; U.S. MARSHAL ERIC

KUSHI; SGT. DECLAN LUDINGTON;

DET. RYAN SHEEHAN; and JOHN

DOES 1-5,

     Defendants.

_____

DEPOSITION

_____

WITNESS:                 SERGEANT DECLAN LUDINGTON

DATE:                    Wednesday, October 8, 2025

START TIME:              10:21 a.m., ET

END TIME:                12:11 p.m., ET

REMOTE LOCATION:         Remote Legal platform

PROCEEDINGS OFFICER:     Stephanie Webster, CER-3580

JOB NO.:                 41676

guess, 1400 and on.

Q    So this would have been a later shift?

A    Yes.

Q    Okay.  Other than the memo book entries that we're looking at right now, to your knowledge, did you personally author any other documentation with respect to the arrest or interaction with Mr. Escobar?

A    No, ma'am.

Q    Thank you.  I'm going to close out of this. Okay.  So just let's talk about the next thing you remember.  You received a call from a supervisor to assist.  What did you do next?

A    We went to the location where the US Marshals were present.

Q    Do you recall where that was?

A    It was 40 Featherbed Lane.

Q    Before you got to the location, were you given any information about what you would be assisting with?

A    Yes.

Q    What information did you have?

A    I was told it was an escaped prisoner out of Queen's Court.

Q    Were you given any other pertinent information?

A    As far as just the brief overview, that's kind

of what I was given.

Q    Okay.  Did all -- did you and the other two officers that were listed in your memo book go to the location on Featherbed Lane altogether?

A    Yes.

Q    Who was the operator?

A    I -- I don't recall who was driving the car.

Q    To your knowledge, is there any documentation that would tell us that?

A    Maybe, I'd say possibly their memo book.

Q    Okay.  Did you see anything in your memo book that would indicate what position you were in the vehicle?

A    I didn't -- I didn't see anything.  No.

Q    Okay.  When you arrived at the location, what was the first thing that you did?

A    We proceeded to go into the apartment complex.

Q    When you arrived, were U.S. Marshals outside or were they already inside?

A    There are U.S Marshals present already on the scene.  I believe they were inside.

Q    And is that inside the building or inside the apartment itself, to your knowledge?

A    Inside of the building.

Q    Did you confer with any of the marshals prior

arriving at the location or during your discussion on the sixth floor, did you learn anything about Mr. Escobar other than that he had absconded from court?

A    Essentially just he was an absconder from court.  He -- he's an escapee case, s.

Q    Were you personally aware of Mr. Escobar before the state?

A    No, ma'am.

Q    So to your knowledge, you had never arrested him or interacted with him?

A    No.  Not to my knowledge.

Q    So is it fair to say that you were not aware of Mr. Escobar's criminal history, the details of it, other than him absconding from court?

A    All I -- all I was aware of that he was an escapee from court that -- at this moment.

Q    Okay.  What happened after your meeting on the sixth floor hallway?

A    There was a brief standoff, US Marshal, Regional Fugitive Task Force was pretty much at the door -- at the target door.  They eventually gained entry into the apartment.

Q    Okay.  How did they gain entry?

A    I believe they breached the door.

Q    Approximately how long were the marshals and

officers outside the apartment door before the door was breached?

A    I think we were standing up there for -- I mean, this is obviously an approximation for I'd say maybe 15 to 20 minutes.

Q    What was going on during that 15 to 20 minutes?

A    I believe they were having a back and forth at the door trying to have -- whoever opened the door.

Q    Were you given any information about whose residence this location was?

A    At that time, no.

Q    Were you present while this back and forth was going on at the threshold of the door?

A    Yes.  I was standing behind in the hallway.

Q    Do you recall who was engaging in the verbal back and forth with the person inside the apartment?

A    One of the task force officers.  I can't be sure of who.

Q    What is your understanding of the reason the door was breached?

A    I believe they breached it to make entry.

Q    What happened next?

A    Door was breached.  We then -- basically the task force officers entered the apartment.  I followed

behind them.  And as we entered the apartment, one of the task force officers basically made contact with the -- the escapee, hiding --

Q    How did he make contact -- oh, I apologize.  I didn't mean to cut you off.  Go ahead.

A    I believe he saw him.

Q    Where was he?

A    He was either in or around a -- a couch.

Q    Where were you when Mr. Escobar was observed by this task force member?

A    I was towards the rear of the stack.  I believe it was -- you could call it maybe a living room area.

Q    How long were you inside the apartment until anyone made contact or observed Mr. Escobar?

A    It was fairly quick.

Q    Prior to making contact with Mr. Escobar, did you personally search anywhere in the apartment looking for him?

A    At that time I was still entering.  So I was in the rear, just kind of following.

Q    So easy answer is no, you weren't doing the searching?

A    I was in there, I had my flashlight.  I was just -- I was still looking around.

Q    Did you enter any of the rooms other than the living room?

A    I don't believe I did, for what I can recall.

Q    Okay.  When the door was first breached, were there civilians present inside the apartment that you could immediately see?

A    I wasn't close enough to actually look inside the apartment when it was breached.

Q    Do you know if anyone was asked to leave the apartment?

A    I know that there were civilians on scene. I'm not sure if they were in the apartment or showed up on scene after.  I -- I don't -- I don't recall exactly where they came from.

Q    What happened after one of the task force members saw Mr. Escobar?

A    They went to apprehend Mr. Escobar.

Q    Can you be a little more specific?  What did you observe?

A    Basically they went to go make contact with Escobar.  Escobar ended up on the ground, and then from there a -- a brief struggle ensued.

Q    Okay.  When Mr. Escobar was first located -- I know you said he was either in or around the couch.

A    Yes.

Q    What position was he in; standing, sitting, lying down --

A    I am not --

Q    -- when he was located?

A    I'm not sure.

Q    Well, you said he ended up on the ground. That implies at some point he was up.  Did you personally observe him standing at any point prior to him being cuffed?

MS. ANDERSON:  Objection.

THE WITNESS:  I don't recall.

MS. ANDERSON:  You can answer.

THE WITNESS:  I don't recall basically what his position was before he ended up on the floor.

BY MS. PANOUSIERIS:

Q    Which task force members were attempting to apprehend as you said Mr. Escobar?

A    It was Marshal Kushi, Detective Correa, and the -- the man, I believe, was wearing the Yankees shirt.

Q    Did Officer Sheehan enter the apartment with you?

A    He entered at -- at some time.  Yes.  I'm not exactly when he actually flowed into the apartment, but he was in the apartment.  Yes.

Q    Do you know if he was in front of you or behind you as you went in?

A    He was behind us.

Q    Okay.  The three task force members that you mentioned, in what way did they attempt to apprehend Mr. Escobar?  If you -- did you witness any of that to specifically be able to tell me how they engaged with him?

A    I can pretty much go from when he was on the ground.

Q    Let's start there, then.

A    Okay.  Basically, Mr. Escobar was tensing, wasn't really giving his hands, so he ended up being tased by one of the task force officers.  And then I -- I was the one that actually physically put handcuffs on Mr. Escobar.

Q    How many times was Mr. Escobar tased?

A    I know for sure once, but possibly twice.

Q    In what parts of his body was he tased?

A    Unsure where the -- the prongs actually struck?

Q    You mentioned that Mr. Escobar was on the ground when he was tased, correct?

A    Yes.

Q    Prior to being tased, did you hear any

instruction from Mr. Escobar to put his hands behind his back?

A    I don't really recall exactly what was said while in the apartment.

Q    Other than the one or two tasings you just mentioned, did you observe any other uses of force while inside the apartment?

A    I did observe a hand strike.

Q    Okay.  Tell me about that.

A    One of the task force officers punched Mr. Escobar, I believe, in his upper body.

Q    Do you know which task force member?

A    I believe it possibly could have been Detective Correa.

Q    Did that hand strike occur before or after the tasing?

A    That was before the tasing.

Q    Are there any other uses of force that you could describe witnessing inside the apartment?

A    That's what I witnessed.

Q    How long was the interaction approximately from the time Mr. Escobar was located to the time he was in cuffs?

A    It was fairly quick.  It happened very fast, say maybe a couple minutes, if that.  We -- but like I

said, it was -- it was very quick.

Q    You described being the person to physically cuff Mr. Escobar.  Can you tell me about the moments before that cuffing?  What were you doing?

A    I was trying to place him in cuffs, and I was struggling to place him in cuffs.

Q    When you were trying to place him in cuffs, can you describe his body position?

A    I think he was on the floor at this point.  I believe when I was trying to put him in cuffs, he was on his -- basically, pretty much on the floor, I think he was on his back, and I was just having a hard time controlling his hands that put him in cuffs -- sorry.  No.  He was laying face down.  Sorry.

Q    No problem.  Were other officers making physical contact with Mr. Escobar while you were attempting to place him in restraints?

A    Yeah.  I think they were trying to assist as well.

Q    Approximately how many other officers or task force members were assisting?

A    I'd say total -- I think they all were.

Q    And I think at this point, we've identified Correa, the marshal with the Yankees jersey --

A    Yeah.

Q    -- yourself, Officer Sheehan, U.S. Marshal Kushi.

A    Yes.

Q    Have I missed anyone that you can recall inside the apartment?

A    I think that's it.

Q    And to your recollection, all of the officers, including yourself, put hands on Mr. Escobar to assist.

MS. ANDERSON:  Objection.

You can answer.

THE WITNESS:  I believe I don't know if Sheehan put hands on.  He was kind of just at the door, just providing kind of rear security.  Myself, yes, I -- I was trying to cuff him, so yeah.

BY MS. PANOUSIERIS:

Q    What was happening directly before Detective Correa punched Mr. Escobar in the upper body?

A    I -- I don't know.  Honestly, I don't know because that was the -- I basically know from when he was on the ground to basically, now I'm trying to cuff this man.

Q    Was Mr. Escobar on the ground or standing when you observed him being the hand strike by Correa?

A    I believe he was on the ground.

Q    What is your understanding of why a hand

strike was implemented at that point?

A    To gain basically control of a subject.

Q    How many times did you -- did Detective Correa strike Mr. Escobar?

A    I noticed one strike.

Q    Did Mr. Escobar say anything during this interaction?

A    I -- I can't recall exactly.

Q    You reviewed the video, right?

A    I did.

Q    So you heard him screaming?

A    It was very loud.  Yes.  The whole situation was loud.

Q    Did you recall hearing on the video someone saying, Hit him, hit him?

A    I did hear that.  Yes.

Q    Do you know whose voice that was?

A    I do not.

Q    Did you hear someone say, Tase him -- tase him?

A    I heard tase.  Yes.

Q    And do you know whose voice that was?

A    I do not know.

Q    Did you personally say hit him or tase him at any time while inside the apartment?

A    Not to my knowledge.

Q    Approximately how big was Mr. Escobar at the time, height and weight?

A    I don't -- I don't know.

Q    Well, let's start here.  How tall are you?

A    I am 5'10.

Q    And back in 2019, what was your approximate weight?

A    It was a little bit heavier, probably about 200.

Q    And just for the record, as you sit here today, what's your approximate weight?

A    I think like, about 190, 195.

Q    If you had to estimate, would you say Mr. Escobar is about your size, smaller, larger, back in 2019?

A    I mean, if you would show me maybe the pedigree or something like that, I could definitely -- usually should be listed on the pedigree, I would think.

Q    Oh, that's okay.  Yeah.  I have the info.  My question is just if you can remember.

A    I'd say maybe at least -- maybe my height I'd say, maybe a little taller, from my recollection.  Like I said, I don't -- I'm not entirely sure.

Q    That's okay.  Approximately how old do you

structures in place in your training to distinguish between the types of force and when they are appropriate.

A    Basically just the levels of force and attempting to gain control of the subject.  So like I said, every situation is different.  So, you know, it warrants different techniques.

Q    In this situation, it appears that there were approximately at least five officers or marshals, task force members inside the unit.  Did -- from your observations, did you feel that Mr. Escobar could not be apprehended by those five individuals without Tasers or punches?

A    Yeah.  Personally, I felt unsafe.  Yes.

Q    Why did you feel unsafe?

A    Well, it's very dangerous going into its structure.  It's an unknown structure.  And I didn't know if possibly Mr. Escobar was armed or what his true intentions actually were.  I've never dealt with him before.

Q    That's true in a lot of situations where you go to apprehend someone, correct?  It may be a new, unfamiliar place and an unfamiliar suspect?

A    Yes.

          MS. ANDERSON:  Objection.

A    He was stiff before he was tased.  His arms were very stiff.

Q    Did you make contact with Mr. Escobar before he was tased?

A    Yes.

Q    Did the other officers that we've been discussing also make contact with Mr. Escobar before he was tased?

A    I believe some of them did.  Yes.

Q    At any time when you were interacting with Mr. Escobar, was he standing?

A    From what I remember, my recollection, pretty much when I was interacting with him, he was -- he was on the ground.

Q    Did there come a time when you were able to restrain Mr. Escobar with handcuffs?

A    Yes.

Q    Was he still on the ground when you did this?

A    When I was able to put the handcuffs on, yes, he was on the ground.

Q    Okay.  At that point, did all force cease?

A    Yes.

Q    Did you observe any injuries on Mr. Escobar after placing cuffs in him?

A    I observed a little bit of blood on his head.

appeared to guide him down stairs.

Q    And where were you at that point?

A    I was walking down the stairs in the vicinity of them, from what -- what I remember.

Q    That was going to be my question.  If you were called during the escort down the stairs, if -- you were one of the escorting officers or just following?

A    I believe I was just -- I was -- I believe I was just following them, from what I remember.

Q    From your observations as Mr. Escobar went down the stairs, did it appear that he could stand up on his own?

A    He was -- he was walking.  Yeah.

Q    Was he walking without assistance?

A    They were holding him while he was kind of, you know, walking, but they were guiding him down the stairs.

Q    What's the next thing you remember?

A    He was loaded into my police vehicle.

Q    Was it a marked car that day?

A    No.  It was an unmarked black van.

Q    Okay.  That's the type of vehicle that the warrant squad typically drives, correct -- an unmarked van?

A    Right.  Yeah.

Q    Okay.  After Mr. Escobar was loaded into the van, what did you do next?

A    We cleared the block, and then I brought him to the hospital.

Q    Okay.  On the scene prior to transporting Mr. Escobar to the hospital, did you speak with any of your fellow officers or task force members about what happened inside the apartment?

A    On scene?

Q    Correct.

A    I don't know what was stated actually on scene.

Q    What is the first thing -- withdrawn.

Do you recall, at some point after the arrest, speaking with your fellow officers and task force members about what happened inside the apartment?

A    Specifically, I -- I can't recall an actual conversation.  We may have talked about it in passing, but I can't give you, like a -- like a actual -- what was said kind of thing.  I -- I don't remember.

Q    What is your understanding of the protocol for reporting uses of force within the NYPD?  What kind of paperwork has to be filled out?

A    TRI.

Q    And that's threat, resistance and injury?

A     Yes.

Q     Have you reviewed any TRI from this case?

A     I did look at a TRI.  Yes.

Q     And were you the author of that TRI?

A     No.

Q     Do you know who it was?

A     I -- I don't recall who actually wrote the TRI.

Q     At any time, were you asked to give either a verbal or a written statement about what occurred inside the apartment?

A     No.

Q     Were you ever approached by IAB about this incident?

A     No.  I was not.

Q     Were you ever called by the CCRB about this incident?

A     No.

          MS. ANDERSON:  Stephanie, I was just going to ask if, like, not -- it's not imminent, but I was just wondering, can we take a bathroom break?  Like, relatively so --

          MS. PANOUSIERIS:  Yeah.  We can do it now.  Now's fine.  Yeah.

          MS. ANDERSON:  Are you fine --

MS. PANOUSIERIS:  5, 10 --

MS. ANDERSON:  -- I just need five minutes if that's okay.

MS. PANOUSIERIS:  Yeah.  Okay.  Five minutes.  No problem.  Let's go off the record.

(Off the record.)

THE PROCEEDINGS OFFICER:  We are on the record.

BY MS. PANOUSIERIS:

Q    Okay.  Sergeant, let's talk about what happened after Mr. Escobar was placed in the vehicle.  I believe you said that you secured the area or the officer secured the area; is that right?

A    Well, securing is, I mean, like, leaving the area.

Q    Okay.  I don't want to misunderstand.  So after Mr. Escobar was placed into the police vehicle, did you immediately take him to the hospital, or did anything else happen on scene of any significance?

A    Basically just waited for the rest of the cars to clear, and then we made our way to the hospital.

Q    Oh, I see.  So when you say clear, you're talking about all the other police vehicles that may have arrived?

A    Clear the block, yeah.  Like the --

Q    Understood.

A    -- tactical officers' cars, and stuff like that.

Q    Okay.  Did any other officers or marshals accompany you in the van to the hospital?

A    It was myself, Sheehan, and Pena.

Q    Was there any conversation during that car ride with Mr. Escobar that you remember?

A    Not that I recall.

Q    Did you go to the hospital immediately? Meaning were there any stops along the way, or did you go from the scene directly to the hospital?

A    We went from the scene to the hospital.

Q    Did you or any other officer that you observed render any kind of first aid to Mr. Escobar before arriving at the hospital?

A    No.  He's pretty much just sitting in the back.

Q    When Mr. Escobar was being apprehended, was the door of the apartment open or closed?

A    Judging by the video, it was slightly opened.

Q    Are you referring to the video filmed from outside the hallway on a cell phone?

A    That I reviewed.  Yes.

Q    Okay.  And then you also reviewed one from

inside the apartment, it's like sitting on a dresser?

A    Yes.  Yeah.

Q    When did you first become aware that those videos existed?

A    When I came down here.

Q    When did you first learn about this lawsuit?

A    Oh, God.  It was -- I want to say maybe -- I say almost two years ago.  So it's been a while.  Yeah.

MS. PANOUSIERIS:  I'm sorry, you guys. My cord's not working.  Can we go off the record really quick?

MS. ANDERSON:  Sure.

THE PROCEEDINGS OFFICER:  We are off the record.

(Off the record.)

THE PROCEEDINGS OFFICER:  We are on the record.

BY MS. PANOUSIERIS:

Q    Sergeant, which hospital was Mr. Escobar transported to in your van?

A    I believe it was Bronx-Lebanon.

Q    Did you go in through the emergency department?

A    The side, I believe it was the -- could have been the ER, but it was the side -- side entrance.

Q    Did you remain with Mr. Escobar during the entire hospital visit?

A    No.

Q    Did one of the other two officers, to your knowledge, stay with Mr. Escobar during the hospital visit?

A    No.  We did not.

Q    Did you turn Mr. Escobar over to different officers once you arrived at the hospital?

A    Yes.

Q    Was that right when you arrived, or sometime later, to the best of your recollection?

A    It's pretty much when we arrived.  We walked in, and then we were met with other members of the Regional Fugitive Task Force, their supervisor, and possibly the guys that we were with, it was a group --

Q    Okay.

A    -- when we transferred custody there.

Q    To the task force?

A    Yes.

Q    Okay.  Is there anyone in particular you recall being part of that group that was Mr. Escobar was turned over to?

A    The supervisor Sergeant Bier was on scene.

Q    Okay.  And is Sergeant Bier an NYPD officer

who is deputized on the task force?

A    Yes.

Q    To your knowledge, was he leading this particular apprehension?

A    He seemed to be, at the time of the hospital in charge.

Q    Okay.  Did you turn over Mr. Escobar to this group of task force members prior to him being seen by the medical unit?

A    This was before.

Q    Okay.  So just as soon as you got there, the group was there, you turned him over?

A    Yeah.

Q    Where did you go after that?

A    We went 98 -- or back onto routine patrol.

Q    And was that you, Sheehan and Pena, all three of you?

A    Yep.

Q    To your knowledge, was Officer Pena ever inside the apartment unit where the apprehension took place?

A    That I'm -- I'm not aware of it, was or not.

Q    Did there come a time that you learned if any officer or marshal was injured during this apprehension?

A    No.  I mean, not at that moment.  No.

A     That was -- well, they do it every year, but last year I did the HRFA training, High-Risk Fugitive Apprehension Training.

Q     Okay.  You became a task force member shortly after this incident with Mr. Escobar, right?

A     No.  This is actually; I was brand new to Warrants at this point.

Q     I see.  Okay.  I don't want to mix up the timeline.  When did you become a task force member?

A     A few years after this incident.

Q     Okay.  Did you participate in any joint task force apprehensions other than Mr. Escobar's prior to become part of the task force?

A     Every once in a while, if they needed additional units, we would be called to go out there and assist them.

Q     Currently, today as a task force member, do you wear a body worn camera when you go out on a job?

A     I do not.  No.

Q     At the time of this incident, did warrant squad members wear body worn cameras?

A     No.  We didn't have them yet.

Q     Do -- to your knowledge, do warrant squad members now have body worn cameras?

A     Do now?  Yes.

Q    Do you recall when they became part of the warrant squad, standard uniform?

A    I believe it was, I want to say a couple -- couple years ago.  But they are fairly new still.

Q    Okay.  Did you ever wear a body worn camera as a warrant squad member?

A    I did.

Q    So it was implemented sometime before you left that unit, fair to say?

A    Yes.  Yeah.

Q    To your knowledge, did anyone conduct a canvas for video inside the apartment building or surrounding areas in -- with respect to this incident?

A    I know myself and my guys did not.  I can't speak on what was done with task force though.

Q    If a canvas was conducted, are you aware of any paperwork where it would indicate that it happened?

A    In regards to the video?

Q    Yes.  So if an officer went out and canvassed, where would they write down canvas negative or canvas found this?

A    From my knowledge, I believe you can put that on a TRI.

Q    Okay.  During the interaction with Mr. Escobar inside the apartment, did you observe any strikes using