# EXHIBIT H

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

_____

TYREL ESCOBAR,

     Plaintiff,

  -against-                      Case No.:

DET. LUIS CORREA;               22 cv 08434

DET. JAMIE ROSADO;

U.S. MARSHAL KEVIN KAMROWSKI;

U.S. MARSHAL ERIC KUSHI;

SGT. DECLAN LUDINGTON;

DET. RYAN SHEEHAN; and

JOHN DOES 1-5,

     Defendants.

_____

DEPOSITION

_____

WITNESS:              KEVIN KAMROWSKI

DATE:                 Thursday, January 15, 2026

START TIME:         1:20 p.m., ET

END TIME:           2:24 p.m., ET

REMOTE LOCATION:    Remote Legal platform

PROCEEDINGS OFFICER:  Jill Brown, CER/CDR-4978

JOB NO.:             45081

to an address that they had for Mr. Escobar.

Q    Okay.  And did you, in fact, go to that location in the Bronx?

A    Yes.

Q    Did you conduct any physical surveillance of that location when you came to it?

A    I believe we sat outside for a little bit, and then we had -- there was three of us there.  So one of us stayed outside, and Correa and I went inside the building.

Q    At any point prior to entering the apartment inside that building, did you see Mr. Escobar go in or out?

A    We talked to neighbors who confirmed that he was in the apartment.

Q    Did you personally speak to those neighbors, if you remember?

A    Yes.

Q    Okay.  And when you say neighbors, can you recall if they were on the same floor, somewhere else in the building?

A    Yes.  It was a woman that was on the same floor.  They said -- I guess she -- she sold, like, baked goods out of her apartment and she had said that they had just sold some baked goods, cupcakes or

something like that to the people in that apartment and she recognized them from a photo.

Q    She recognized Mr. Escobar from a photo?

A    Correct.

Q    Got it.  Okay.  I believe you stated that it was you and Detective Correa who was a task force member, who went up to the apartment first; is that accurate?

A    Yes.

Q    What did you do when you got up there?  Just tell me what happened next?

A    Initially, we were just waiting for a while because we were waiting to get instructions from the other guys who were out doing interviews at different locations.

Q    To my understanding, from prior testimony, there were approximately four locations that were simultaneously being searched or observed in order to locate Mr. Escobar; is that your understanding?

MR. GITLIN:  Objection.  What prior?  His prior testimony, what prior?

MS. PANOUSIERIS:  No, I'm sorry.  Just testimony in this case from an NYPD officer who informed us that that was the case.  I won't get into details of how they -- why they were at those specific locations.

I just want an idea of if there were multiple teams out at the same time.  Can he answer?

THE WITNESS:  From my recollection, there was.  I don't know how many, though.

MS. PANOUSIERIS:  Okay.

THE WITNESS:  There was at least one other group.

BY MS. PANOUSIERIS:

Q    Other than the location in the Bronx, did you personally go to any other location to locate Mr. Escobar?

A    No.

Q    So you were waiting for a while.  Approximately how long?

A    I don't remember.

Q    While you were waiting for further instructions, did you attempt to knock on the door or inquire with the people within?

A    Yes, at a certain point, we did.

Q    And what happened?

A    I believe initially nobody was answering the door.

Q    Okay.  And at what point did something change?

A    Well, we had the neighbor that stated that he was in there, and I believe somebody from one of the

other locations called and confirmed that he -- they -- they got word from one of the other family members that he was in there.

Q    Okay.  And then with that information, what did you do next?

A    We -- again, we continue to knock on the door. We're knocking for a long time before we got any response at all.

Q    At some point, did you get a response?

A    Yeah, there was somebody from the inside yelling.

Q    Okay.  And do you remember anything about what they were yelling?

A    They were just yelling a bunch of obscenities, you know, Get the f away from my door.  They were just, you know, basically telling us to go away.

Q    What happened next?

A    I continued to -- at that point, so I went from knocking on the door to actually, like, kicking the door.

Q    And were you able to gain access to the apartment by kicking the door?

A    Yeah, at some point -- I don't remember if she opened it or if it -- if it -- if it came open.  When I was kicking, she was at the door.  There was a female

there that was at the door the whole time, kind of, you know, yelling stuff at us.  And at some point, the door did open.

Q    At the point when the door did open, was it just you and Correa, or were there additional officers on the scene at that point?

A    No.  Prior to that, when the neighbor told us that there was -- that he was in there, and then we heard from the other guys that he was in there, I believe it was Correa who contacted additional members from NYPD to come assist us.

Q    Okay.  And did you wait for those officers to arrive before kicking in the door?

A    Yeah.

MR. GITLIN:  Objection.

THE WITNESS:  I believe they were there.

MS. PANOUSIERIS:  You're just reserving your objection, Adam?

MR. GITLIN:  Yes.

MS. PANOUSIERIS:  I'm sorry, I don't want to cut you off.  Okay.

MR. GITLIN:  Well, it just -- I'm just not -- it may mischaracterize Mr. Kamrowski's testimony earlier.

MS. PANOUSIERIS:  Understood.  It's not

Q    Did there come a time that you located Mr. Escobar?

A    Yes.

Q    Approximately how long did it take to find him from the time that you entered the apartment to the time that you made -- you were able to visualize him?

A    I don't recall.

Q    Who, other than yourself, was inside the apartment searching for Mr. Escobar?

A    I know I was in there, Correa was in there, I believe the two NYPD guys, and I don't know where Kushi was.  He was someplace close behind.  I don't know if he was still in the hallway or if he was in the apartment.

Q    Okay.  To your recollection, was there anyone else other than the woman -- as you started your search, was there anyone else you had to ask to leave?

A    There were, I believe, two other people in the apartment, but they were in a room down at the end of the hall.

Q    Did they remain in the apartment during your search?

A    I don't remember.  I don't think we got to them at that point.  We were still in the front of the apartment, from what I remember.

Q    Okay.  How did you come to find Mr. Escobar?

A     So when -- when he escaped from the courthouse, he -- they sent us a photograph -- a surveillance photograph of him leaving the courthouse and he had a very specific tracksuit on, and when we're in the first room -- I believe it was the first room there, I saw what looked like the same clothing near the bottom of a couch.

Q     What did you do when you observed that clothing?

A     Initially, I thought, because I -- I saw a door behind the couch, kind of the couch was pushed up against the door, so I thought, you know, maybe he would -- you know, he was hiding in that closet or whatever it was, but when I moved the couch, I noticed the couch was a little heavy and when I lifted up the -- the cushions, he was actually in the sofa.

Q     And just to clarify, when you say in the sofa, you mean below the seat cushions --

A     He was --

Q     -- but not on the ground?

A     -- he -- he was underneath the cushions.

Q     Okay.  What did you do next?

A     Commands were given for him to -- you know, to present himself, which he ignored.  Again, this guy was a dangerous guy.  He had, I think, over 30 something

arrests, weapons offenses, attempted murder.  He had all these different allegations.  There was -- there was kitchen knives scattered all over the floor, which was kind of weird, where we were.  After I gave him a couple commands, and he didn't respond, I took out my Taser and I deployed my Taser.

Q    How many times?

A    It was -- it's only one cartridge, so when you shoot it, that's it.  It's -- you can't shoot it multiple times.

Q    And does it have two prongs or one prong that -- once you shoot it?

A    It's two.  So it's one shot, but two -- two prongs will come out.

Q    And to your knowledge, did the prongs actually make contact with Mr. Escobar?

A    I don't recall.  Because of the way he was, like, positioned in the couch, I don't -- I don't remember if both of them made contact.  The way he reacted, it didn't seem like they did.

Q    So, to clarify, Mr. Escobar was still inside the couch when you deployed your Taser?

A    Yeah.  He wasn't responding to any of our commands, from what I remember.

Q    You mentioned his position.  Can you describe

what you mean about what position he was in?

A   He was kind of like -- like, curled up.  Like, try like he -- it wasn't an easy place to get, so it was like he was trying to look like maybe make himself small.

Q   Following deployment of your Taser, was any additional force necessary to gain Mr. Escobar's compliance?

A   Yeah.  He's still -- after the deployment, he still didn't comply with anybody.

Q   Okay.  What happened next?

A   I -- I -- since I deployed my Taser, I actually backed up because when you shoot it, wires come out.  So I was trying to figure out, okay, did I make connection, did I not make connection.  And then I -- I do recall at some point he was standing up.  And then, I -- I believe it was Correa and the other NYPD guys attempted to grab them and put them into handcuffs.

Q   When you say attempted to grab him, what do you mean?  Was their attempt not successful?

A   Well, he wasn't complying.  He wasn't like -- it wasn't like he just gave up and said, Oh, you got me.  He just -- he was -- he was not complying.  He was kind of still, like, swinging his arms.  He was -- there was a bunch of stuff going on, but he was not complying.

Q    Did you observe -- other than the grabs you've described, as well as the Taser you deployed, did you observe any other kind of force or contact between officers and Mr. Escobar?

A    I think he went to the ground and that was it. Then I remember he -- I -- I remember some point he was on the ground, and then he was handcuffed.

Q    Did you witness any closed fist strikes?

A    No.

Q    How -- approximately how long did it take to gain Mr. Escobar's compliance from the time you found him until he was in cuffs?

A    I don't remember.  It was -- I mean, it may have been fast, but in situations like that, it feels like time is moving slow.

Q    Understood.  My clients say the same thing every time.  After Mr. Escobar was in cuffs, what happened next?

A    There was a number of people.  I guess they -- they came up from outside, family members from maybe in the building, because we heard a bunch of people outside the apartment yelling -- the -- the woman from the beginning was initially yelling.  I believe we made phone calls to the other guys to let him know that we had him in custody.

give me one moment, please.

Here's the beginning of the question. Ready, Kevin?

THE WITNESS:  Yes.

THE PROCEEDINGS OFFICER:  Okay.  The question is,

(Readback as requested)

THE WITNESS:  No.

MR. GITLIN:  And I would just object to the question as sort of being part of the topics that within the Doe letter related to surveillance that should not have been -- that should not be asked about.

But you can continue.

MS. PANOUSIERIS:  I acknowledge that objection, and I won't ask any further questions related to that.

BY MS. PANOUSIERIS:

Q   Other than the use of your Taser, did you make physical contact with Mr. Escobar at any time prior to him being in handcuffs?

A   I don't believe so.  No.

Q   Okay.  Are you aware if the location where you apprehended Mr. Escobar was the address listed on the arrest warrant?

A   No.

Q    I'm sorry, I asked a bad question.  You're not aware or no, it wasn't?

A    I don't know if that address was on the arrest warrant.  No, I don't.

Q    Okay.  To your recollection, just to clarify, you don't remember any force being used on Mr. Escobar other than the Taser and what is typically I would call -- you can correct me if I'm wrong -- body holds in order to get -- to put them in cuffs; is that fair?

MR. GITLIN:  I'll object to that question.

BY MS. PANOUSIERIS:

Q    You can answer.

MR. GITLIN:  As vague and potentially compound.

But you can answer, Mr. Kamrowski.

THE WITNESS:  Oh, what was the question again?

BY MS. PANOUSIERIS:

Q    I'm just wondering if -- I want to clarify that you don't recall any force other than the Taser and attempts to get Mr. Escobar into cuffs?

A    I -- yeah, that's what I remember.  I remember him -- I remember, you know, me obviously, deploying a Taser, and then I -- I remember guys trying to get him

onto the ground, and then his hands behind his back. So, yeah, I do recall, I mean, that that took force.  He -- he wasn't going -- he wasn't cooperating.

Q    Other -- is there any kind of way you would categorize the kind of force used to take him to the ground in your law enforcement parlance?  The NYPD calls it body holds, but I don't want to put words in your mouth.  How would you describe that force to take him to the ground?

A    Restraint techniques.  I -- I don't know.

Q    Okay.  Did you observe Mr. Escobar's head hit any stationary objects during this force?

A    No.  But he was in a couch.  So I'm positive, you know, it wasn't comfortable getting in there and coming out probably wasn't any easier.

Q    Was he in the couch for the duration of the force?

A    I -- he was -- I don't know how long he was in there.  I -- he was in -- he was in the couch.  He was not -- like I said, he was not responding to -- he wasn't responding to commands to -- to show himself or come out.

Q    That was actually my next question.  What are the types of commands that you and the other officers were giving?

A    I can't recall.  I mean, we're talking six years ago, so I don't remember the exact verbiage I used.

Q    That's fair.  Is there something in your typical practice during an apprehension, you would ask of a suspect in order to gain their compliance?

A    Yeah.  Usually, you know, come out, let me see your hands.  You know, we'd say, you know, move slowly, look this way, look that way.

Q    How long after commands were given was force used?

A    I don't recall, but to -- to be honest, in this situation, I don't think anybody was hesitating because of his criminal history.  This guy was a pretty dangerous guy on paper when you look at it.

Q    Did you have some concern that he would be a danger to the other officers?

A    Absolutely.

MS. PANOUSIERIS:  So, Mr. Kamrowski, I actually think I don't have anything further.  It went a lot quicker than I thought it would.  So I will turn this over to counsel for the NYPD officers, Ms. Anderson.  She is also going to question you today.

MS. ANDERSON:  Perfect.  I was just going to ask -- I don't think I'm going to have a ton either, to be honest